UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AKEEM SHERIFF,<br><br>                              Petitioner,<br><br>-against-<br><br>PAUL ARTETA, Sheriff, Orange County Correctional Facility; MARKWAYNE MULLIN, Secretary, Department of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; and TODD BLANCHE, U.S. Attorney General,<br><br>                              Respondents. | Case No. 1:26-cv-04071 (JLR)<br><br>**<u>OPINION AND ORDER</u>** |

JENNIFER L. ROCHON, United States District Judge:

Petitioner Akeem Sheriff ("Petitioner") is a legal permanent resident ("LPR") who was detained by Customs and Border Protection ("CBP") on October 28, 2025, upon his return to the United States from a five-day trip abroad. *See* Dkt. 6 ("Pet." or the "Petition") ¶¶ 16, 20-21. Before the Court is his Petition for a writ of habeas corpus under 28 U.S.C. § 2241, in which Petitioner — currently in the custody of United States Immigration and Customs Enforcement ("ICE") — contends that his continued detention (now over seven months) violates his Fifth Amendment due process rights, and in which Petitioner seeks an individualized bond hearing to remedy that violation. *Id.* at 8-9. For the following reasons, the Petition is GRANTED.

## BACKGROUND

Petitioner was born in Trinidad and Tobago and has lived in the United States as an LPR since July 18, 2007. *Id.* ¶¶ 15-16. In 2021, Petitioner was convicted of two separate charges of petit larceny under New York state law and sentenced to eight months' incarceration. *Id.* ¶ 18; Dkt. 9 ("Paulino Decl.") ¶¶ 8-9; *see also* Dkt. 10-2 at 16. He has not been arrested for, charged with, or convicted of any crime in the United States since then. Pet. ¶ 19. However, on October 28, 2025, CBP arrested Petitioner at a New York airport, upon his return to the United States

from a five-day trip to St. Lucia. *Id.* ¶ 20. He was placed in removal proceedings and, on December 29, 2025, an immigration judge ordered that he be removed to Trinidad and Tobago. *Id.* ¶¶ 22, 25; *see* Dkt. 10-5 at 2, 4. Petitioner appealed this order on December 31, 2025, and the appeal remains pending. Pet. ¶ 26. He has not left detention since his arrest by CBP, and he is currently in ICE custody. *Id.* ¶¶ 24, 35. Respondents maintain that Petitioner is detained pursuant to both 8 U.S.C. § 1225(b)(2)(A) and 8 U.S.C. § 1226(c)(1)(A). Paulino Decl. ¶ 11.

On February 9, 2026, Petitioner filed a petition for a writ of habeas corpus in which he challenged the legal basis for his detention. Pet. ¶ 27; *see generally Sheriff v. Catletti*, No. 26-cv-01092 (GHW), 2026 WL 1298174, at *2 (S.D.N.Y. May 12, 2026). On May 12, 2026, Judge Woods denied that petition, holding that Petitioner is "lawfully detained under [8 U.S.C. §] 1225(b)(2)(A)," because Petitioner's petit larceny convictions render him "an 'applicant for admission' who is 'seeking admission'" within the meaning of that statute, and thus "[o]nce CBP determined that he was 'not clearly and beyond a doubt entitled to be admitted' due to [those] criminal convictions, Section 1225(b)(2)(A) mandated his detention." *Sheriff*, 2026 WL 1298174, at *2. *See also* 8 U.S.C. § 1101(a)(13)(C)(v) (providing that LPRs "shall . . . be regarded as seeking an admission into the United States for purposes of the immigration laws" when they "ha[ve] committed an offense identified in section 1182(a)(2) of this title"); *id.* § 1182(a)(2)(A)(i)(I) (including "crime[s] involving moral turpitude"); *Sheriff*, 2026 WL 1298174, at *2 ("Petit larceny is a crime involving moral turpitude. Thus, a[n LPR] who has committed petit larceny is regarded as 'seeking an admission' when seeking to reenter the United States." (citation omitted)). Moreover, because Section 1225(b)(2)(A) provided a lawful basis for Petitioner's detention, Judge Woods did "not decide whether Section 1226(c)(1)(A) also independently authorizes his detention," as Respondents argued in response to that petition. *Sheriff*, 2026 WL 1298174, at *2 n.2.

2

After the previous petition was fully briefed, but before Judge Woods had ruled on it, Petitioner filed a letter arguing for the first time that the duration of his detention — by then, more than six months — entitled him to an individualized bond hearing no matter the statutory basis, under the standard set by *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Id.* at *5 n.6. In his opinion and order of May 12, 2026, Judge Woods declined to address that argument given its untimeliness, but he noted that Petitioner was "free to raise this new ground for relief in a separate habeas petition should he wish to do so." *Id.* Three days later, on May 15, 2026, Petitioner filed the instant Petition, in which he seeks an individualized bond hearing under the test set by *Mathews* given the duration of his detention. *See* Pet. at 9. In accordance with a briefing schedule set by the Court, Respondents filed opposition on June 1, 2026, *see* Dkt. 11 ("Opp."), and Petitioner filed a letter-reply the next day, *see* Dkt. 12 ("Reply"). Therefore, the Petition is fully briefed.

## DISCUSSION

As noted above, Petitioner has been detained since October 28, 2025. Pet. ¶¶ 21, 24. Because Judge Woods has already resolved the question of the basis for Petitioner's detention, the sole question before this Court is whether a noncitizen LPR detained for seven months under Section 1225(b)(2)(A) is constitutionally entitled to an individualized bond hearing. Petitioner argues that due process challenges to prolonged mandatory detention based either on Section 1225 or Section 1226 are reviewed under *Mathews*, in accordance with the Second Circuit's decision in *Black v. Decker*, 103 F.4th 133, 147 (2d Cir. 2024). *See* Reply at 1. Respondents argue broadly that Petitioner has no constitutional right to a bond hearing because, as a noncitizen "seeking admission," he is due only so much process as Congress provides by statute, and Section 1225(b)(2)(A) does not provide for bond hearings. Opp. at 9-11. Respondents further contend that "it is unclear whether" *Black*'s framework applies in this context, *id.* at 14,

3

and that, even if it does, Petitioner is not entitled to a bond hearing under it, *id.* at 14-17.  The Court takes these arguments in turn.

## I.    Petitioner Is Entitled to Due Process with Respect to His Detention

The Court begins with Respondents' argument that "the constitutional rights of arriving [noncitizens] are limited" to those provided by Congress.  *Id.* at 9; *see also id.* at 15 (arguing that, "as a returning LPR, [Petitioner] may well enjoy fewer protections than otherwise would be accorded to non-returning LPRs").  Petitioner contends, to the contrary, that he "has a right to Due Process just as would a continuously present resident [noncitizen]."  Reply at 2.  The Court agrees with Respondents that there are limitations on Petitioner's due process rights as a returning LPR, but disagrees that those limitations eliminate due process rights in the context of prolonged detention.

For many years, LPRs "could come and go from the United States on short trips without formally seeking admission" upon their return, *Centurion v. Sessions*, 860 F.3d 69, 72 (2d Cir. 2017), so long as the trip was "innocent, casual, and brief," *Rosenberg v. Fleuti*, 374 U.S. 449, 461 (1963).  Accordingly, "a resident [noncitizen] who once committed a crime of moral turpitude could travel abroad for short durations without jeopardizing his status as a lawful permanent resident."  *Vartelas v. Holder*, 566 U.S. 257, 265 (2012).  That principle was abrogated by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), *see Centurion*, 860 F.3d at 72, which included the provision — now codified as 8 U.S.C. § 1101(a)(13)(C)(v) — that LPRs convicted of crimes of moral turpitude "are regarded as seeking admission into the United States," *Vartelas*, 566 U.S. at 263.  Therefore, under IIRIRA, an LPR "must seek formal admission — even if returning from a brief trip abroad — if he has committed a drug offense or a crime of moral turpitude."  *Centurion*, 860 F.3d at 72.  In other words, an LPR like Petitioner "is treated as a new arrival to our shores."  *Vartelas*, 566 U.S. at

265.[1]  That shift in status is significant, because "[i]t is well established that certain constitutional

protections available to persons inside the United States are unavailable to [noncitizens] outside

of our geographic borders."  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  And, under the legal

premise known as the entry fiction, a noncitizen "seeking admission" but detained upon (or

shortly after) his arrival is "'treated' for due process purposes 'as if stopped at the border.'"

*Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quoting *Shaughnessy v.*

*United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)).  So far, then, Respondents are correct:

because LPRs previously convicted of a crime of moral turpitude are treated as seeking

admission, they are due less process upon returning from a short trip abroad than an LPR who

never left the country or who does not have similar criminal history.  But the question is, to what

processes does this diminished entitlement apply?

This question was squarely addressed in *Al-Thuraya v. Warden, Orange Cnty. Corr.*

*Facility*, 809 F. Supp. 3d 135 (S.D.N.Y. 2025).  There, as here, the government argued that

noncitizens who are "deemed applicants for admission" and detained under Section 1225(b)

"have *no* constitutional due-process rights," are ineligible for prolonged-detention analysis under

*Black*, and must, instead, rely only on those processes allotted to them by Congress.  *Id.* at 141.

The *Al-Thuraya* court disagreed, reasoning that the entry fiction is a "narrowly tailored"

exception to "the general rule that due process applies to all persons."  *Id.*  That exception "exists

to accommodate the political branches' broad prerogative to exclude," such that "[a]pplicants for

admission must look to Congress and the Executive Branch for the procedures determining their

legal admission into the country."  *Id.* at 141-42.  And, the court explained, that is the entry

---

[1] To be clear, however, IIRIRA still provides that LPRs *generally* "shall not be regarded as seeking an admission into the United States for purposes of the immigration laws."  8 U.S.C. 1101(a)(13)(C); *accord Jobe v. Whitaker*, 758 F. App'x 144, 146 (2d Cir. 2018) (summary order).

fiction exception's sole purpose: it is "inapplicable in the context of [the petitioner]'s request for a bond hearing," because such a request does not implicate the Executive or Legislative power to admit or exclude — indeed, it does not "concern [the petitioner's] application at all, just the legality of his detention while that application is being reviewed." *Id.* at 143. Such a request is "in the dead center of the Fifth Amendment's protections," which the entry fiction exception does not proscribe. *Id.*

The cases Respondents cite here are in accord with the analysis in *Al-Thuraya*. *See* Opp. at 9 ("The Supreme Court 'has long held that a[] [noncitizen] seeking initial admission to the United States requests a privilege and has no constitutional rights *regarding his application*, for the power to admit or exclude [noncitizens] is a sovereign prerogative." (emphasis added) (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982))); *see also id.* at 10 ("[U]nder the Due Process Clause, applicants for admission have 'only those rights *regarding admission* that Congress has provided by statute.'" (emphasis added) (quoting *Thuraissigiam*, 591 U.S. at 140)). In other words, Respondents have established here only that Petitioner, because he is deemed to be "seeking admission," is due less process than other noncitizens and LPRs with respect to his readmission into the United States — not that he is stripped of due process rights regarding his ongoing detention. *See Brissett v. Decker*, 324 F. Supp. 3d 444, 451 (S.D.N.Y. 2018) ("The Court rejects Respondents' argument that the detention of [noncitizens] seeking admission is a sovereign prerogative of the political branches to the extent Respondents contend that they have the unreviewable power to strip LPRs of due process rights to a determination of the necessity of their detention."); *Joseph v. Arteta*, No. 26-cv-02979 (JGK), 2026 WL 1193489 at *5 (S.D.N.Y. Apr. 30, 2026) (holding that LPR previously convicted of crime involving moral turpitude and returning from short trip abroad "is entitled to the full due-process protections of the Fifth Amendment," including with respect to challenging detention); *Peguero v. Arteta*, No. 26-cv-

6

01715 (JAV), 2026 WL 821428, at *3-4 (S.D.N.Y. Mar. 25, 2026) (same); *cf. Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (explaining that noncitizens may "challenge through habeas corpus the legality of their ongoing detention," and that such "review is not limited to evaluating the lawfulness of detention when it is first imposed . . . but is also available to challenge whether, at some point, an ongoing detention has become unlawful").[2]

Therefore, to the extent Petitioner's due process rights are limited under IIRIRA, the Court finds that such limitation does not render Petitioner ineligible for due process on a challenge of the legality of his allegedly prolonged detention.

## II.    *Black v. Decker* **Applies**

Respondents next argue that "it is unclear whether" *Black* is applicable to Petitioner, because the petitioners in *Black* were not "seeking admission" into the United States at the time of their initial detention.  Opp. at 14.  Petitioner contends that *Black* applies to all "challenges to mandatory detention under the Immigration and Nationality Act."  Reply at 1.  The Court agrees with Petitioner.

In *Black*, the Second Circuit explained that "a statute permitting indefinite detention of a[] [noncitizen] would raise a serious constitutional problem," and therefore held "that due process bars the Executive from detaining such individuals for an unreasonably prolonged period under section 1226(c) without a bond hearing."  *Black*, 103 F.4th at 143 (quoting *Zadvydas*, 533 U.S. at 690).  The *Black* court thus "adopt[ed] the flexible *Mathews* framework to assess, case by

---

[2] Respondents also rely on *Mezei* in arguing that a noncitizen seeking admission is due only the process prescribed by Congress.  *See* Opp. at 10.  But the noncitizen there had returned to the United States in the midst of the Cold War after traveling "behind the Iron Curtain for 19 months," and he was detained at the border based on "danger to the national security."  *Mezei*, 345 U.S. at 214, 216.  "Numerous courts in this District have . . . conclud[ed] that *Mezei* is not applicable outside the national security context."  *Gutierrez v. Dubois*, No. 20-cv-02079 (PGG), 2020 WL 3072242, at *8 (S.D.N.Y. June 10, 2020) (collecting cases); *accord Salgado v. Francis*, No. 25-cv-06524 (VEC), 2025 WL 2806757, at *5 n.9 (S.D.N.Y. Oct. 1, 2025).

case, whether an individual's prolonged section 1226(c) detention violates due process," and while the court declined to create any "bright-line constitutional rule" as to the point at which mandatory detention becomes violative, it noted "that any immigration detention exceeding six months without a bond hearing raises serious due process concerns." *Id.* at 150.

While Respondents express general uncertainty that *Black* applies in Petitioner's context, the basis for that uncertainty is only that an LPR "returning from a brief trip is differently situated from a continually present resident [noncitizen], and therefore does not have a right to identical treatment." Opp. at 14 (quoting *Jobe*, 758 F. App'x at 146). As the Court has explained, the difference in that treatment applies to the LPR's admission, not his detention. Respondents otherwise provide no persuasive basis to conclude that the Second Circuit's concerns regarding mandatory detention are confined to that imposed by Section 1226(c) and inapplicable to that imposed by Section 1225(b)(2)(A).[3] To the contrary, "the vast majority of courts to address whether individuals detained under § 1225(b) have a right to a bond hearing have held that they do." *Al-Thuraya*, 809 F. Supp. 3d at 143 (collecting cases and following suit); *see also Joseph*, 2026 WL 1193489, at *6 ("Although *Black* dealt with detention under § 1226(c), its reasoning applies with equal force to [noncitizens] detained under § 1225(b)."); *Peguero*, 2026 WL 821428, at *4 (applying *Black* to detention under § 1225(b)(2)(A)); *Bermudez Paiz v. Decker*, No. 18-cv-04759 (GHW) (BCM), 2018 WL 6928794, at *12 (S.D.N.Y. Dec. 27, 2018) ("I therefore join my colleagues who have held — both before and after *Jennings* — that there comes a time when the government can no longer rely on the mandatory language of § 1225(b) to keep an arriving [noncitizen] behind bars with no individualized showing that he or she presents a flight risk or a danger to the public."). The

---

[3] The Court need not decide whether Section 1226(c) provides an independent and secondary basis for Petitioner's detention, as Respondents contend, *see* Opp. at 8-9, because, even if it does, *Black* applies to evaluating such a detention.

Court agrees with that majority of courts, and joins them here in finding the logic of *Black* applicable to detention under Section 1225(b)(2)(A).

The Court's conclusion that the Second Circuit's Section 1226(c) analysis in *Black* also applies to Section 1225(b)(2)(A) is further supported by the prior practice of the majority of courts in this District.  Indeed, before *Black*, the Second Circuit held that "section 1226(c) must be read as including an implicit temporal limitation," such that noncitizens detained under that section "must be afforded a bail hearing before an immigration judge within six months of his or her detention."  *Lora v. Shanahan*, 804 F.3d 601, 614, 616 (2d Cir. 2015), *vacated sub nom. Shanahan v. Lora*, 583 U.S. 1165 (2018).  That decision was later vacated and remanded "for further consideration in light of *Jennings v. Rodriguez*, 583 U.S. [281] . . . (2018)."  *Shanahan*, 583 U.S. at 1165.[4]  Before it was vacated, however, "[t]he majority of courts in this District ha[d] concluded that *Lora* must also apply to arriving LPRs detained under § 1225(b)(2)(A)."  *Clerjuste v. Decker*, No. 17-cv-04252 (VSB), 2017 WL 6388952, at *3 (S.D.N.Y. Aug. 12, 2017) (collecting cases), *vacated in light of Jennings*, *sub nom.*, *Bugianishvili v. McConnell*, No. 15-2699, 2018 WL 11587690 (2d Cir. July 10, 2018); *see also, e.g.*, *Arias v. Aviles*, No. 15-cv-09249 (RA), 2016 WL 3906738, at *10 (S.D.N.Y. July 14, 2016) ("[T]he Second Circuit's decision in *Lora* dictates that the [c]ourt interpret 8 U.S.C. § 1225(b)(2)(A) to include a reasonable temporal limitation of six months on [petitioner's] detention so as to avoid serious constitutional concerns.").

Therefore, the Court joins those courts that have held that *Black* applies to detention under Section 1225(b) and, accordingly, finds that "the *Mathews* framework . . . govern[s]."  *Black*, 103 F.4th at 145-46.

---

[4] In *Jennings*, the Supreme Court held that the texts of Section 1225(b)(2) and Section 1226(c) cannot be read to require periodic bond hearings during mandatory detention, but left open the question of whether such bond hearings are a constitutional requirement.  583 U.S. at 297, 312.

**III.    Petitioner is Entitled to a Bond Hearing Under *Mathews v. Eldridge***

Finally, Respondents argue that even if *Mathews*'s balancing test applies through *Black*, it comes out in Respondents' favor.  *See* Opp. at 15-17.  The Court disagrees.

"In the Second Circuit, courts have looked to the *Mathews v. Eldridge* three-factor balancing test when determining the adequacy of process in the context of civil immigration confinement."  *Villegas ex rel. Guzman Andujar v. Francis*, 815 F. Supp. 3d 248, 260 (S.D.N.Y. 2025).  Under that test, the Court considers "(1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of any additional or substitute procedural safeguards'; and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'"  *Black*, 103 F.4th at 151 (quoting *Mathews*, 424 U.S. at 335).  Applying that test here, the Court finds that Petitioner's continued detention violates due process.

**A.    Private Interest**

Petitioner's "interest in being free from imprisonment" "is the most significant liberty interest there is."  *Velasco Lopez*, 978 F.3d at 851.  That is true even where the imprisonment stems "in some sense" from a criminal adjudication, such as here where Petitioner's prior conviction is "the premise for applying section 122[5(b)(2)(A)]."  *Black*, 103 F.4th at 151.  Indeed, like the petitioners in *Black*, Petitioner "ha[s] served his entire sentence" for that prior conviction for a non-violent offense, and his current "detention[] did not arise from new or unpunished conduct."  *Id.*  Petitioner, then, is no exception to the general rule: "[L]iberty is the norm and detention is the carefully limited exception."  *Id.* (internal quotation marks omitted) (quoting *Velasco Lopez*, 978 F.3d at 851).

Respondents concede that Petitioner's private interest is "weighty, particularly in light of the equities Petitioner describes in the [P]etition." Opp. at 15; *see also* Reply at 2-3 (arguing that "Petitioner's manifold positive equities," including his "strong family ties," weigh heavily against any government interest). Those equities include Petitioner's caretaker role for his sister's children, who are three years old and thirteen months old, respectively, and who have been separated from him for more than seven months. *See* Dkt. 6-1 at 35 (Petitioner's sister, in sworn affidavit, explaining that Petitioner "helps [her] and [her] children with daily responsibilities like getting them ready for school, preparing meals, keeping them safe and entertained . . . [and] pick[ing] them up from school [and] watch[ing] them," and describing him as "one of [her] strongest supporters in raising [her] children and helping them grow"); *id.* at 33 (Petitioner's mother, in sworn affidavit, describing Petitioner as "the foundation of [their] household" and a "source of light for his three nieces and one nephew," who "need him in their lives"); *see also Peguero*, 2026 WL 821428, at *4 (finding that noncitizen's detention had "'seriously affected' his private interest more generally" given his separation from his young son and family "who depend on [him] as a caretaker" (quoting *Black*, 103 F.4th at 151)). Accordingly, the first *Mathews* factor weighs heavily in Petitioner's favor.

### B. Risk of Erroneous Deprivation

The Court also finds that the risk of erroneous deprivation is very high here. As a sister court recently explained, "the current procedures afforded to guard against the erroneous deprivation of Petitioner's liberty interest are virtually nonexistent," inasmuch as there is "no statutory right to an individualized bond hearing to test the need for detention" under Section 1225(b)(2)(A). *Peguero*, 2026 WL 821428, at *4. Respondents do not address whether there are any available procedures under Section 1225(b)(2)(A); instead, oddly, they state that there are "limited" procedures available under Section 1226(c), yet admit that those procedures "are

inapplicable here." Opp. at 16. In other words, Respondents concede that there are no procedures presently available to Petitioner with respect to his ongoing detention. As the Second Circuit has explained, "[i]n the absence of any meaningful initial procedural safeguards, it appears to us that almost any additional procedural safeguards at some point in the detention would add value. The most obvious of these . . . would be an individualized bond hearing at which an IJ can consider the noncitizen's dangerousness and risk of flight." *Black*, 103 F.4th at 153. Even if the Court were to accept Respondent's characterization of Petitioner's seven-month detention as one of "relatively limited duration," Opp. at 16, for purposes of this factor, the brevity of a deprivation has nothing to do with whether it has been erroneously imposed.[5] Accordingly, the second *Mathews* factor weighs in Petitioner's favor.

### C.       Government's Interest

Finally, the Court finds that the government's interest does not weigh in favor of withholding a bond hearing from Petitioner.

Respondents first argue that the government has a strong and well-established interest in "(1) ensuring the noncitizen's appearance at proceedings, and (2) protecting the community from

---

[5] Similarly, Respondents' citations to cases in which courts have found longer periods of detention *not* to violate due process, as well as their distinguishing citations to cases in which courts have found due process violations but *only for* longer periods of detention, *see* Opp. at 12-14, are not particularly persuasive here. The length of Petitioner's detention has crossed *Black*'s threshold and thus "raises serious due process concerns." *Black*, 103 F.4th at 150; *see also D.C. v. Noem*, --- F. Supp. 3d ---, 2026 WL 787895, at *6 (S.D.N.Y. Mar. 20, 2026) ("[L]ower court decisions in this Circuit — before and after *Black* — have underscored the heightened severity of detention exceeding six months, and in cases under § 1226(c), have been more likely to find a due process violation where detention without a bond hearing has extended beyond six months."), *appeal filed sub nom.*, *C. v. Noem*, No. 26-1396 (2d Cir. May 20, 2026). And while that length does not create an automatic entitlement to a bond hearing, it does trigger review under *Mathews*, which is the heart of the Court's inquiry here. *See Joseph*, 2026 WL 1193489, at *6 (rejecting argument that five-month detention is necessarily too short to violate due process, because "[t]he ultimate question . . . is not whether [the petitioner]'s detention lasts some arbitrary amount of time — it is whether [the petitioner]'s private interests in liberty outweigh any [g]overnment interest in further detention"); *accord Araujo-Cortes v. Shanahan*, 35 F. Supp. 3d 533, 548-49 (S.D.N.Y. 2014).

12

noncitizens who have been involved in crimes that Congress has determined differentiate them from others." *Id.* (quoting *Black*, 103 F.4th at 153). The argument is perplexing, not least because it is identical to the argument that the Second Circuit rejected in *Black*, the case Respondents pulled it from. As the Second Circuit explained, a bond hearing "do[es] nothing to undercut those interests. At any ordered bond hearing, the IJ would assess on an individualized basis whether the noncitizen presents a flight risk or a danger to the community[.]" *Black*, 103 F.4th at 153-54.

Respondents also argue that Petitioner's detention "furthers 'the Government's interest in preventing the entry of unwanted persons,' which 'is at its zenith at the international border.'" Opp. at 16 (quoting *Palma v. Arteta*, --- F. Supp. 3d ---, 2026 WL 697015, at *13 (S.D.N.Y. Mar. 12, 2026)). A bond hearing does not impact that interest, either, because it "does not affect the [g]overnment's determination of whether [Petitioner] is admissible." *Joseph*, 2026 WL 1193489, at *7; *see also Al-Thuraya*, 809 F. Supp. 3d at 143 (explaining that danger to community and risk of flight are "precisely what a bond hearing would address" and that "[w]hat's not at issue is any review of the agency's determination that [the petitioner] is inadmissible or removable; that's for the Second Circuit — and if it remands, the agency — to decide").

Nor have Respondents identified any administrative or fiscal burden they would face in providing a bond hearing to Petitioner, and any such burden is too minimal to outweigh the liberty interests of noncitizens subject to prolonged detention. *See Black*, 103 F.4th at 154 ("We expect that the additional resources that the government will need to expend to justify continued detention at bond hearings will be minimal — and will likely be outweighed by costs saved by reducing unnecessary detention."). Indeed, bond hearings "are a routine feature of immigration proceedings" frequently ordered by district courts. *Veletanga v. Noemi*, No. 25-cv-09211 (NSR),

13

2025 WL 3751865, at *7 (S.D.N.Y. Dec. 26, 2025); *see also D.C.*, 2026 WL 787895, at *10 ("[A] bond hearing stands to cost the [g]overnment time and resources, but . . . these costs merit limited weight in the *Mathews* analysis."); *Hyppolite v. Noem*, 808 F. Supp. 3d 474, 494 (E.D.N.Y. 2025) ("[T]he fiscal and administrative burdens of giving [the petitioner] the process he is due — a routine bond hearing before an IJ — are minimal.").

Therefore, Respondents fail to show a compelling interest in Petitioner's continued detention, and the third *Mathews* factor weighs in favor of Petitioner.

## CONCLUSION

Having found that Petitioner's prolonged detention violates his due process rights, the Court GRANTS his habeas petition to the extent he seeks a bond hearing. Accordingly, by **July 6, 2026**, the immigration court must either (1) hold a bond hearing at which the government bears the burden of proving, by clear and convincing evidence, that Petitioner is a danger to the community or a flight risk, or (2) release Petitioner. In determining whether to grant bond, the immigration judge shall consider, on the record, the availability of alternative conditions of release; in determining the amount of any bond imposed, the immigration judge shall consider the Petitioner's ability to pay. Respondents shall file an update with the Court, no later than **July 7, 2026**, certifying that Petitioner has received a bond hearing. Petitioner's request, under *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), for release pending the adjudication of his habeas petition is DENIED as moot. The Clerk of Court is respectfully directed to CLOSE the case.

Dated: June 22, 2026
     New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge

14